Slip Op. 11-110

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                :
ZHEJIANG NATIVE PRODUCE         :
& ANIMAL BY-PRODUCTS IMPORT &   :
EXPORT CORP., et al.,           :
                                :
              Plaintiffs,       :   Before: Richard K. Eaton, Judge
                                :
      v.                        :   Court No. 02-00057
                                :
UNITED STATES,                  :
                                :
              Defendant,        :
                                :
      and                       :
                                :
THE AMERICAN HONEY PRODUCERS     :
ASSOCIATION and THE SIOUX       :
HONEY ASSOCIATION,              :
                                :
              Def.-Ints.        :
_____:
```

OPINION AND ORDER

[The United States Department of Commerce's Results of Redetermination Pursuant to Remand are remanded.]

Dated: September 6, 2011

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell, Mark E. Pardo*, and *Ned H. Marshak*), for plaintiffs Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association; Alfred L. Wolff, Inc.; C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Jane C. Dempsey*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Sapna*

*Sharma*), of counsel, for defendant United States.

*Kelley Drye & Warren, LLP* (*Michael J. Coursey* and *R. Alan Luberda*), for defendant-intervenors the American Honey Producers Association and the Sioux Honey Association.

Eaton, Judge:  This case involves the Department of Commerce's (the "Department" or "Commerce") finding of critical circumstances in the final results of Honey From the People's Republic of China ("PRC"), 66 Fed. Reg. 50,608, 50,610 (Dep't of Commerce Oct. 4, 2001) (notice of final determination of sales at less than fair value), *as amended by* Honey from the PRC, 66 Fed. Reg. 63,670 (Dep't of Commerce Dec. 10, 2001) (notice of amended final determination of sales at less than fair value and antidumping duty order) (the "Final Results").  It is now before the court following the most recent remand order directing the Department to reconsider its critical circumstances determination.  *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States,* 34 CIT __, Slip-Op. 10-30 (Mar. 24, 2010) (not reported in the Federal Supplement) ("*Zhejiang IV*").  In remanding the case, the court observed that "Commerce has the authority to exercise its discretion to apply any other reasonable method or look to any other reasonable time period in making its critical circumstances determination."  *Id.* at __, Slip Op. 10-30 at 20.

On December 8, 2010, Commerce filed the Results of

Redetermination Pursuant to Remand (the "Second Remand Results"),

finding that critical circumstances existed for Zhejiang Native

Produce & Animal By-Products Import & Export Corp. ("Zhejiang")

because "record evidence demonstrates that importers knew or

should have known that the exporter was selling the subject

merchandise at less than its fair value. . . ."  Second Remand

Results at 42.

Plaintiffs[1] ask the court find that critical circumstances

did not exist.  The defendant-intervenors support the Second

Remand Results in their entirety.[2]  Commerce, in addition to

seeking to have the Second Remand Results sustained, asks for a

further remand so that it might use the same methodology, as

employed here, for the other named plaintiffs.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)

(2006) and 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (B)(i) (2006).

For the reasons set forth below, the Second Remand Results are

---

[1]   "Plaintiffs" refers collectively to Zhejiang Native
Produce & Animal By-Products Import & Export Corp.; Kunshan
Foreign Trade Co.,; China (Tushu) Super Food Import & Export
Corp.; High Hope International Group Jiangsu Foodstuffs Import &
Export Corp.; National Honey Packers & Dealers Association;
Alfred L. Wolff, Inc.; C.M. Goettsche & Co.; China Products North
America, Inc.; D.F. International (USA) Inc.; Evergreen Coyle
Group, Inc.; Evergreen Produce, Inc.; Pure Sweet Honey Farm,
Inc.; and Sunland International, Inc.

[2]   Defendant-intervenors' arguments are substantially the
same as the Department's.  Thus, only Commerce's arguments are
summarized herein.

not supported by substantial evidence and the matter is remanded
to Commerce with instructions.


BACKGROUND

In 1994, Commerce initiated an unfair trade investigation of
honey from the PRC.  Subsequently, the investigation was halted
and the Department entered into a suspension agreement with the
PRC.  *See* Honey From the PRC, 60 Fed. Reg. 42,521 (Dep't of
Commerce Aug. 16, 1995) (suspension of investigation) (the
"Suspension Agreement").  The Suspension Agreement was in effect
from August 16, 1995 through August 16, 2000.  Honey From the
PRC, 65 Fed. Reg. 46,426 (Dep't of Commerce July 28, 2000)
(termination of suspended antidumping duty investigation).

In 2000, following the termination of the Suspension
Agreement, and at the urging of the domestic industry, Commerce
initiated a second investigation.  Honey from Argentina and the
PRC, 65 Fed. Reg. 65,831 (Dep't of Commerce Nov. 2, 2000)
(initiation of antidumping duty investigations) (the "Second
Investigation").  During the course of the Second Investigation,
the petitioners alleged the existence of critical circumstances.
*See* 19 U.S.C. § 1673b(e)(1).  If the criteria for critical
circumstances are met, then antidumping duties are made effective
ninety days earlier than the effective date of antidumping duties
in the absence of critical circumstances.  19 C.F.R. § 351.206(a)

(2010).

Commerce identified the period of investigation (the "POI")
as January 1, 2000, through June 30, 2000, a period during which
the Suspension Agreement was in effect.  Thus, during the course
of its investigation the Department used the POI to determine
both if respondents were dumping their merchandise, and for the
purpose of determining if critical circumstances were present.
*See* Honey From the PRC, 66 Fed. Reg. 24,101, 24,106 (Dep't of
Commerce May 11, 2001) (notice of Preliminary Results of sales at
less than fair value) ("Preliminary Results").

Following the investigation, Commerce's final determination
contained an affirmative dumping finding.  Honey From the PRC, 66
Fed. Reg. 50,608 (Dep't of Commerce Oct. 4, 2001) (notice of
final determination of sales at less than fair value), *as amended
by* Honey from the PRC, 66 Fed. Reg. 63,670 (Dep't of Commerce
Dec. 10, 2001) (notice of amended final determination of sales at
less than fair value and antidumping duty order).  The final
determination also contained an affirmative finding of critical
circumstances, based upon Commerce's frequently employed 25%
method for imputing knowledge of dumping to respondents.  Final
Results, 66 Fed. Reg. at 50,610.  This imputation of knowledge of
dumping was predicated on the Department's practice of
considering

        margins of 25 percent or more for [export price] sales

> sufficient to impute knowledge of dumping . . . .  In
> other words, in cases where, as here, export price is
> calculated by reference to sales made to unaffiliated
> purchasers in the United States, and Commerce
> determines that the antidumping duty margin with
> respect to those sales is 25% or more, Commerce
> "imputes" knowledge of dumping to the importer . . . .

*Zhejiang Native Produce & Animal By-Products Import & Export*

*Corp. v. United States*, 27 CIT 1827, 1842-43 (2003) (not

published in the Federal Supplement) (footnote omitted; first

alteration in original) ("*Zhejiang I*").  Commerce found that,

based on the 25% method, "there is evidence of the knowledge of

dumping . . . [that was] demonstrated by the fact that Zhejiang,

Kunshan, High Hope, and the PRC-wide entity all have dumping

margins of over 25 percent."  *Id*. at 1843 (citation omitted).

Plaintiffs sought judicial review of the Final Results in

this Court and, among other things, objected to the use of

Commerce's 25% methodology, arguing that compliance with the

Suspension Agreement foreclosed the imputation of knowledge of

dumping.  The court found for the Department, and held that the

Suspension Agreement did not prevent Commerce from imputing

knowledge of dumping using its 25% method.  *Id*. at 1849-50.

Therefore, the court sustained Commerce's affirmative critical

circumstances determination.  *Id*. at 1851.

Plaintiffs appealed *Zhejiang I* to the Federal Circuit.  On

appeal, plaintiffs again argued that the existence of the

Suspension Agreement prevented the imputation of knowledge of

dumping using Commerce's 25% methodology.  The Federal Circuit

held that plaintiffs' compliance with the Suspension Agreement

precluded a finding that knowledge of sales at less than fair

value could be imputed using the Department's 25% methodology

during the POI.  *See Zhejiang Native Produce & Animal By-Products*

*Imp. & Exp. Corp. v. United States*, 432 F.3d 1363, 1368 (Fed.

Cir. 2005) (citation omitted) ("*Zhejiang II*") ("As Zhejiang

states, 'it strains credibility to suggest that Commerce could

establish minimum prices for honey designed to "prevent the

suppression or undercutting of price levels of the United States

honey products" and then determine that U.S. importers purchasing

honey in accordance with these pricing guidelines should have

known these sales would be found to be at less than fair value.'

When all factors are considered, there is not substantial

evidence to support the finding of critical circumstances.").

Therefore, the Federal Circuit reversed the court's critical

circumstances holding, and remanded the case "for appropriate

further proceedings."  *Id.*

       The court then remanded the matter to Commerce for

reconsideration of the critical circumstances issue.  *Zhejiang*

*Native Produce & Animal By-Products Imp. & Exp. Corp. v. United*

*States*, 30 CIT 715, 725-26 (2006) (not published in the Federal

Supplement) ("*Zhejiang III*").  Pursuant to the Federal Circuit

ruling, in its remand instructions the court directed Commerce to

further consider "its critical circumstances finding, provided

that in no event shall Commerce impute to plaintiffs any

knowledge prohibited by the [Federal Circuit]'s decision . . . ."

*Id.*

Following remand, Commerce filed its Remand Redetermination,

finding that critical circumstances did not exist.[3]  The court

remanded again, explaining that the Federal Circuit's decision in

*Zhejiang II* did not prevent the Department from considering

analyses other than the 25% methodology or time periods other

than the POI, in making its critical circumstances determination.

*Zhejiang IV,* 34 CIT at __, Slip Op. 10-30 at 20 ("Commerce has

the authority to exercise its discretion to apply any other

reasonable method or look to any other reasonable time period in

making its critical circumstances determination.").

For the following reasons, the court finds that the Second

Remand Results are not supported by substantial evidence and

---

[3]      Plaintiffs also moved under USCIT Rule 60(b)
"purporting to seek relief from the . . . court's previous final
judgment in 2004" in which the court held that compliance with a
suspension agreement did not preclude the Department from finding
a respondent to have made sales at less than fair value, *i.e.*,
that it had dumped its merchandise during the POI.  *Zhejiang
Native Produce & Animal By-Products Imp. & Exp. Corp. v. United
States,* 339 F. App'x 992, 993 (Fed. Cir. 2009).  The court denied
this motion by order on September 26, 2007, and the Federal
Circuit dismissed the appeal, finding that it was interlocutory
and, therefore, was "simply an effort to obtain review of an
issue in a pending trial court proceeding without waiting for the
trial court to enter a final judgment in the case."  *Id.* at 994.

remands this matter to Commerce.


## STANDARD OF REVIEW

The court must uphold a final determination by the Department in an antidumping proceeding unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).


## DISCUSSION

I.   Critical Circumstances

Pursuant to 19 U.S.C. § 1673d(a)(3), critical circumstances can be found when:

> (A)(ii) the person by whom, or for whose account, the merchandise was imported *knew or should have known that the exporter was selling the subject merchandise at less than its fair value* and that there would be material injury by reason of such sales, and

> (B) there have been massive imports of the subject merchandise over a relatively short period.

(emphasis added).

If these criteria are met,

> then *antidumping duties are made effective ninety days earlier than the effective date of antidumping duties in the absence of critical circumstances.*  The foundation of this enlarged imposition of antidumping duties is, as the statute states, that the importer "knew or should have known" that the price was below fair value and would materially injure domestic industry, and that there were "massive imports" at dumping prices.

> The statute does not state how "knew or should have
> known" is determined.  Commerce has adopted the general
> practice of imputing such knowledge whenever the
> dumping margin is greater than 25 percent, without
> requiring evidence of actual knowledge.

*Zhejiang II*, 432 F.3d at 1366 (emphasis added) (citation

omitted).


II.  Parties' Positions on Critical Circumstances Finding

In the Second Remand Results, the Department summed up its

critical circumstances findings as follows:

> [T]he Department finds that there is a reasonable basis
> to believe or suspect that the importers of honey from
> the PRC, sold by Zhejiang, during the [less than fair
> value] investigation, knew, or should have known, that
> the exporter was selling the subject merchandise at
> less than its fair value.  The Department's analysis
> indicates that the average values for imports of honey
> from the PRC sold by Zhejiang after the termination of
> the suspension agreement, and during the 190-day period
> between the initiation of the investigation and the
> Preliminary Results, were on average greater than 25
> percent below the normal values calculated during the
> [less than fair value] investigation.  Therefore, we
> find a reasonable basis to impute knowledge of dumping
> by importers of honey from the PRC, sold by Zhejiang,
> during the [less than fair value] investigation, and
> that such importers knew, or should have known, that
> the exporter was selling the subject merchandise at
> less than its fair value.

Second Remand Results at 62—63.

The fundamental difference between the Second Remand Results

and the critical circumstances determination found in the Final

Results resulting from the investigation and first Remand

Determination is that, here, Commerce based its finding on the

period between the initiation of the dumping investigation

(October 26, 2000) and the Preliminary Results (May 11, 2001),

rather than during the POI.[4]  As has been noted, the Suspension

Agreement had terminated on August 16, 2000.

    Plaintiffs make a number of arguments by which they insist

that Commerce's 25% methodology is not lawful when used in an

investigation of an NME respondent.  Pls.' Comm. Rem. Red.

("Pls.' Comm.") 9-21.  Because the court considered these

arguments, and found them without merit in *Zhejiang I*, it will

not address them again.  *See Zhejiang I,* 27 CIT 1827.  In

addition, plaintiffs contend that the Suspension Agreement

eliminated the possibility of finding that plaintiffs had dumped

their merchandise during the POI.  Pls.'s Comments, pages 22-25.

The court has also considered this argument and found it wanting

*See* Order, *Zhejiang Native Produce & Animal By-Products Imp. &*

*Exp. Corp., et al., v. United States*, Court No. 02-00057 (Sept.

26, 2011).

    As to the new issues raised by the Second Remand Results,

plaintiffs raise two main points.  First, they assert the

initiation of the less than fair value investigation cannot be

_____

    [4]    Commerce also used "the average values for imports of
honey from the PRC sold by Zhejiang . . . during the 190-day
period between the initiation of the investigation and the
Preliminary Results" rather than the export price, calculated
during the POI, when making the comparison to normal value.
Second Remand Results at 62-63.

found to have alerted them that prices roughly equal to those set
by the Suspension Agreement were dumped prices.  Pls.' Comm. 25
("Contrary to the Department's suggestion, the fact that an
[antidumping] investigation is initiated does not constitute
evidence that dumping is taking place.  The allegation of dumping
in a Petition is nothing more than an allegation by an adversary.
Respondents do not have the right to file comments opposing
Petitioners' claims or to otherwise participate in the initiation
process.  Thus, the fact that the Department has decided to
initiate an [unfair trade] investigation does not constitute
evidence that the unfair act, in fact, has taken place, let alone
evidence that importers should believe that Petitioners [sic]
allegations have merit.").

In addition, plaintiffs point out that the allegations of
dumping (but not critical circumstances) related to the period
that the Suspension Agreement was in effect.  Plaintiffs point
out that this was a period during which the Federal Circuit has
found that the respondents could not be charged with knowledge of
dumping.  Pls.' Comm. 26 ("Moreover, Petitioners allegations
which led to the Department's decision to initiate its
investigation related to prices paid for honey imports during the
period of time in which the Suspension Agreement was in effect. .
. .  Thus, the Department's decision that 'there is reason to
believe that imports of honey from . . . China are being, or are

likely to be, sold at less than fair value' was expressly rejected by the Federal Circuit's decision in [*Zhejiang II*] that Chinese honey was not being dumped during this period in view of the fact that Chinese prices conformed to the Suspension Agreement.  Accordingly, the Department's belief that its Notice of Initiation rendered Suspension Agreement prices unreliable has been rejected by the Federal Circuit in [*Zhejiang II*] and, accordingly, must be rejected by the Court at this time.")

Second, plaintiffs argue that the 25% method of imputing knowledge of dumping to respondents cannot be found to constitute substantial evidence under the "known or should have known" standard, when the prices used to calculate the margin were essentially the same as those established under the Suspension Agreement.  Pls.' Comm. 28 ("Record evidence in the instant case reveals that from October 26, 2000 [the initiation of the investigation] – May 11, 2001 [publication of the Preliminary Results] the prices which importers paid for honey exported by Zhejiang were "broadly the same as, or slightly higher than, the prices for shipments of honey exported by Zhejiang during the last six months of the Suspension Agreement.")

The Suspension Agreement terminated on April 16, 2000 and the investigation was initiated on October 26, 2000.  Thus, plaintiffs assert that, if knowledge of dumping could not be imputed to the importers based on prices established by the

Suspension Agreement during the POI, then knowledge of dumping
could not be imputed with respect to virtually the same prices
for a period following soon thereafter.  Pls.' Comm. 26 ("[I]f
importers could not be charged with knowledge of dumping with
respect to prices paid during the time period which was the focus
of the Petition, it strains credibility to suggest that they
should be charged with knowledge of dumping when they were paying
the same or slightly higher prices shortly thereafter.").

III. The Department Defends Critical Circumstances Finding

     The Department first argues that "[b]y examining honey sales
in the 190-day period following the expiration of the
[S]uspension [A]greement, Commerce complied with the court's
specific instructions."  Def.'s Rep. to Pls.' Comm. Upon the
Second Remand Redetermination ("Def.'s Rep.") 8.  In other words,
the Department asserts that the use of the time period between
the initiation of the investigation and the Preliminary Results
was specifically authorized by the court in *Zhejiang IV*.

     Next, Commerce asserts that its determination was legally
justified because (1) the initiation of the investigation alerted
plaintiff that the prices formally established by the Suspension
Agreement might be dumped prices, and (2) use of the 25%
methodology, in the period after the Suspension Agreement had
terminated, was valid.

According to Commerce, the basis of the 25% test is that when the antidumping duty margins are 25% or above, Commerce "'expects importers knew or should have known that the prices are too good to be true, whereby a product noticeably undersells its fairly traded competition.'" Def.'s Rep. 10 (quoting Second Remand Results at 51). Commerce emphasizes that it did not impute knowledge of sales at less than fair value to importers during the time when the Suspension Agreement was in effect, but rather during the period immediately after the Suspension Agreement expired. The Department thus argues that it reasonably cited its initiation of the antidumping investigation as a factor in finding critical circumstances, because the commencement of the investigation itself served to put plaintiffs on notice that they could not rely on prices set under the Suspension Agreement as a means to avoid the imputation of knowledge. *See* Def.'s Rep. 13 (. . . once [Commerce] had publicly announced that it had "reason to believe the imports of honey from . . . China are being, or are likely to be sold at less than fair value," importers could no longer reasonably rely on prices issued pursuant to an expired suspension agreement, and assume that imports were not being dumped. . . . Indeed, plaintiffs do not, nor can they, justify importer reliance upon prices from a suspension agreement that had been expressly terminated.").

With respect to the 25% methodology itself, the Department

does not directly address plaintiffs' argument that knowledge of

dumping could not be imputed to the importers when the import

prices were "broadly the same" as those determined by the

Suspension Agreement.  Rather, the Department states:

> In making its critical circumstances determination,
> however, Commerce is not required to compare prices
> provided in a suspension agreement to the prices during
> the time period it examined in making a critical
> circumstances finding.  As previously discussed,
> Commerce normally considers the requirements of the
> statute to be satisfied and will impute knowledge of
> sales at less than fair value during the period of
> investigation if it calculates dumping margins that are
> greater than 25 percent for any respondent.

Def.'s Rep. 15.


IV.  The Department's Critical Circumstances Determination is Not
     Supported by Substantial Evidence

     In *Zhejiang IV*, the court held that Commerce was not

restricted to the POI when applying the 25% methodology, nor was

it required to use that methodology or any particular time period

when making a critical circumstances determination.  34 CIT at

__, Slip Op. 10-30 at 20.  As the court explained,

> The 25 percent method, however, is not the only way in
> which Commerce has imputed knowledge in past
> investigations.  Nor for that matter, has the
> Department restricted itself to the period of
> investigation in making critical circumstances
> determinations.  Prior to its adoption of the 25
> percent method, Commerce found that, with respect to
> respondents from non-market economies, it would use a
> case by case determination "using all available
> information and drawing upon market conditions of the
> industry subject to the investigation" when imputing
> knowledge of less-than-fair value sales.  Potassium

Permanganate From the PRC, 48 Fed. Reg. 57,347, 57,349
(Dep't of Commerce, Dec. 29, 1983) (final determination
of sales at less than fair value) ("*Potassium
Permanganate*").

For instance, in *Potassium Permanganate*, Commerce made
a number of findings that it deemed relevant to its
determination that critical circumstances existed.
First, that United States importers were aware that the
merchandise purchased at "competitive prices" in the
European market and subsequently imported into the
United States originated from the PRC, and therefore
were aware of the price of PRC-sourced potassium
permanganate being sold in both United States and
European markets.  *Id.*  Second, Commerce noted that
importers were aware of the pricing of potassium
permanganate from non-PRC sources and were therefore
aware of the entire range of pricing in a marketplace
where pricing was a major factor in determining sales.
*Id.*  Third, because other foreign producers operated in
non-state-controlled countries, importers should have
known, at least generally, what the value of the
product was in market economy countries, and thus the
minimum fair value of the PRC merchandise.  *Id.*
Fourth, that during the period between the initiation
of the investigation and the Preliminary Results, the
unit price of the merchandise imported from the PRC was
22 percent less than the price imported from the only
other foreign nation exporting the product to the
United States.  Potassium Permanganate From the PRC, 48
Fed. Reg. at 57,349.  Lastly, because importers knew
that the merchandise from the PRC was priced
significantly below that sold for export by the only
other non-United States market economy producer,
importers should have known that the PRC exports were
at less than fair value.  *Id.*  Commerce's critical
circumstances determination was upheld by both this
Court and the Federal Circuit in *ICC Industries, Inc.
v. United States*, 10 CIT 181, 632 F. Supp. 36 (1986),
*aff'd* 812 F.2d 694 (Fed. Cir. 1987) ("*ICC Industries*").

Other Court of International Trade cases shed more
light on practices, other than the 25 percent method,
that can be used in making a critical circumstances
determination.  *See, e.g., Nippon Steel Corp. v. United
States,* 24 CIT 1158, 118 F. Supp. 2d 1366 (2000).
Specifically, the *Nippon* court listed "numerous press

reports, . . . falling domestic prices resulting from
rising imports, and domestic buyers shifting to foreign
suppliers" as evidence that could support such a
determination.  *Id*. at 1168, 118 F. Supp. 2d at 1376
(internal quotation omitted).

In addition to demonstrating that the 25 percent method
is not the only approach that Commerce has used to
impute knowledge of sales at less than fair value, *ICC
Industries* also reveals that Commerce has used at least
one time period other than the period of investigation
as the temporal measure for making a critical
circumstances determination.  In *ICC Industries*, the
period used was "from [i]nitiation of this
investigation to [the] Preliminary Results."  *ICC
Industries*, 10 CIT at 184, 632 F. Supp. at 38.

Indeed, the *ICC Industries* time period appears to be
the period that Congress anticipated would be used in
determining critical circumstances when it stated that
the purpose of the critical circumstances statute was
"to provide prompt relief to domestic industries
suffering from large volumes of, or a surge over a
short period of, imports and to deter exporters whose
merchandise is subject to an investigation from
circumventing the intent of the law by increasing their
exports to the United States during the period between
initiation of an investigation and a Preliminary
[Results] by [Commerce]." H.R. Rep. 96-317, 96th Cong.,
1st Sess. at 63 (1979) . . . .

In addition, Commerce, in its regulations, is directed
to look at a period "beginning on the date the
proceeding begins [*i.e.*, the filing of the
investigation] and ending at least three months later."
19 C.F.R. § 351.206(i).  Thus, it is clear that
Commerce has the authority to evaluate time periods
other than the period of investigation when making
critical circumstances determinations.

*Zhejiang IV*, 34 CIT at ___, Slip Op. 10-30 at 12—15 (emphsis

removed).

In its Second Remand Results, the Department used a time

period different from the POI; and relied on evidence of sales
prices into the U.S. that was different from that used in its
standard 25% methodology.  Otherwise the Department relied on its
standard 25% methodology to impute knowledge of dumping.  As has
been discussed, Commerce cited two factors in reaching its
finding:  (1) that the initiation of the antidumping
investigation of honey from the PRC put the honey importers on
notice that they no longer could rely upon prices issued under
the terminated Suspension Agreement to presume that the imports
were not dumped; and (2) the average values for imports of honey
produced by Zhejiang after the termination of the Suspension
Agreement and during the 190-day period between the initiation of
the investigation and Commerce's publication of the Preliminary
Results were, on average, greater than 25% below the normal
values calculated during the original investigation.  Second
Remand Results at 56, 63.

     As an initial matter, the court finds Commerce's application
of the 25% methodology to the 190-day period beginning at the
initiation of the less than fair value investigation through the
Department's Preliminary Results is clearly authorized by
*Zhejiang IV*.  *See Zhejiang IV*, 34 CIT at __, Slip Op. 10-30 at
20.  Nonetheless, the critical circumstances determination itself
lacks the support of substantial evidence because (1) the
initiation of the antidumping investigation cannot be said to

have put plaintiff on notice that the prices set by the Suspension Agreement were dumped prices, and (2) the prices importers paid did not materially change from the period when the Suspension Agreement was in effect.

The Department's notice argument exaggerates the gravity of Commerce's notice stating that an investigation has been initiated.  According to Commerce, once it "announced that it had 'reason to believe that imports of honey from Argentina and China are being, or are likely to be sold at less than fair value,' importers could no longer reasonably rely on prices issued pursuant to an expired suspension agreement, and assume that imports were not being dumped."  Def.'s Rep. 13 (quoting Second Remand Results at 54).

As is generally the case, here, the less than fair value investigation was initiated as a result of a petition filed by domestic producers.  The petition, however, constitutes an allegation of dumping, not a determination of dumping.  Prior to initiating an investigation, the Department makes no determination with respect to unfair trade practices.  Rather, it merely decides if the petitioners have provided a sufficient basis for initiating an investigation, i.e., whether they allege the elements necessary for the imposition of an antidumping duty. MANUAL FOR THE PRACTICE OF U.S. INTERNATIONAL TRADE LAW 595 (Willam K. Ince & Leslie A. Glick, eds. 2001) ("Generally, the Department

will refuse to initiate only when the petition is clearly

defective – *e.g.*, if the petitioning party has no standing under

the statute, or the petition does not contain basic information

required by the regulations."); *see* 19 U.S.C. § 1673a(c)(1)(A)(i)

("[Commerce] shall . . . determine whether the petition alleges

the elements necessary for the imposition [of unfair trade

duties] . . . ."); *see also Republic Steel Co. v. United States*,

4 C.I.T. 33, 41, 544 F. Supp. 901, 908 (1982) (finding that

"petitions should not be dismissed except for notable

deficiencies . . ."); S. Rep. No. 96-249, at 47 (1979)*, reprinted

in* 1979 U.S.C.A.N.N. 381, 449 ("The committee intends section

702(c)(1) to result in investigations unless the authority is

convinced that the petition and supporting information fail to

state a claim upon which relief can be granted under section 701

or the petition does not provide information supporting the

allegations which is reasonably available to him.").

As plaintiffs note, "the fact that the Department has

decided to initiate an [antidumping] investigation does not

constitute evidence that the unfair act, in fact, has taken

place, let alone evidence that importers should believe that

[p]etitioners [sic] allegations have merit."  Pls.' Comm. 25.

In addition, in this case, the allegation of dumping was for the

period that the Suspension Agreement was in effect, a period

during which the Federal Circuit has found that importers could

not be imputed with knowledge of dumping.

As to the use of prices that were essentially unchanged from those established by the Suspension Agreement, the Federal Circuit in *Zhejiang II* quoted approvingly plaintiffs' assertion that "it strains credibility to suggest that Commerce could establish minimum prices for honey designed to 'prevent the suppression or undercutting of price levels of the United States honey products' and then determine that U.S. importers purchasing honey in accordance with these pricing guidelines should have known these sales would be found to be at less than fair value." *Zhejiang II*, 432 F.3d at 1368 (citation omitted).

The Suspension Agreement terminated on August 16, 2000 and the Department initiated its investigation on October 26, 2000. The Preliminary Results were issued on May 11, 2001.  The Department itself described the prices paid in the months after the expiration of the Suspension Agreement as "broadly the same, or slightly higher" than the prices paid in the last six months of the Suspension Agreement.  Preliminary Results of Second Remand Results at 2 (Dep't of Commerce Sept. 24, 2010).

In *Zhejiang II*, the Federal Circuit found that substantial evidence did not support the proposition that importers knew or should have known the prices during the Suspension Agreement were being sold at less than fair value.  In accordance with this holding, the court further finds that a critical circumstances

determination based solely on prices that are "broadly the same"
as those established under the Suspension Agreement, even if
taken from the period following the Suspension Agreement's
termination, cannot be supported by substantial evidence either.
Put another way, the mere termination of the Suspension
Agreement, without more, does not erase the ability of plaintiffs
to rely on these prices as not being the prices of goods sold at
less than fair value.

Finally, the court notes that, as was shown in *Zhejiang IV*,
Commerce had other evidentiary tools that it might have used to
produce the substantial evidence needed to make its case.  For
instance, in Potassium Permanganate From the PRC, 48 Fed. Reg.
57,347 (Dec. 29, 1983) (final determination of sales at less than
fair value) ("*Potassium Permanganate*"), Commerce found that the
importers were *actually aware* of the pricing of the merchandise
for non-Chinese sources, and were, therefore, "aware of the
entire range of pricing in a marketplace where pricing was a
major factor in determining sales."  In *Nippon Steel Corp. v.
United States*, 24 CIT 1158, 118 F. Supp. 2d 1366 (2000), this
Court listed "numerous press reports, . . . falling domestic
prices resulting from rising imports" to support its
determination.  24 CIT at 1168, 118 F. Supp. 2d at 1376 (internal
citation and quotations omitted).

Here, Commerce has made no effort to demonstrate that the

importers had the actual knowledge of honey prices that was

important in *Potassium Permanganate* and *Nippon*.  Rather than

demonstrating actual knowledge of less than fair value pricing by

the importers, the Department has chosen to impute knowledge

based on the idea that "margins of 25 percent or above 'are of

such a magnitude that the importer should have reasonably known

that dumping exists with regard to the subject merchandise.'"

Second Remand Results at 51 (citation omitted).  While nothing

prevents the Department from using a modified version of its 25%

methodology to identify critical circumstances, in doing so it

must support its determination with substantial evidence.

Commerce has failed to present sufficient evidence to do so here.


                              CONCLUSION

     Because the court has found that Commerce's critical

circumstances determination is not supported by substantial

evidence, the case is remanded.  On remand, the Department may

use any analysis permitted by *Zhejiang IV* to complete its

critical circumstances review, provided that it not use evidence

prohibited by this opinion.  In addition, Commerce may, in its

discretion, reopen the record.  Further, Commerce's request for a

remand to apply the methodology used in the Second Remand Results

for the other named plaintiffs is denied.  Remand results are due

on or before January 6, 2012.  Comments to the remand results are

Court No. 02-00057                                    Page 25

due on or before February 6, 2012.  Replies to such comments are

due on or before February 21, 2012.


                                        ___/s/ Richard K. Eaton___
                                           Richard K. Eaton


Dated:      September 6, 2011
            New York, New York