Slip Op. 13-76

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
ZHEJIANG NATIVE PRODUCE &               :
ANIMAL BY-PRODUCTS IMPORT &             :
EXPORT CORP., et al.,                   :
                                        :
        Plaintiffs,                     :
                                        :
            v.                          :
                                        :
UNITED STATES,                          :       Before: Richard K. Eaton, Judge
                                        :
        Defendant,                      :       Court No. 02-00057
                                        :
          and                           :
                                        :
THE AMERICAN HONEY PRODUCERS            :
ASSOCIATION and THE SIOUX               :
HONEY ASSOCIATION,                      :
                                        :
        Defendant-Intervenors.          :
_____  :


**OPINION**

[The United States Department of Commerce's Final Results of Redetermination are sustained.]

Dated: June 18, 2013

   *Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs.  With him on the brief were *Bruce M. Mitchell* and *Mark E. Pardo*.

   *Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant.  With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Sapna Sharma*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

   *Michael J. Coursey*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors.  With him on the brief was *R. Alan Luberda*.

Eaton, Judge:  Before the court are the Final Results of Redetermination (ECF Dkt. No. 114) ("Third Remand Results") issued pursuant to the court order in *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States,* 35 CIT __, Slip Op. 11-110 (Sept. 6, 2011) (*Zhejiang V*).  At issue is the Department of Commerce's (the "Department" or "Commerce") "critical circumstances" determination in the investigation of Honey from the People's Republic of China ("PRC") covering the period of investigation ("POI") January 1, 2000 through June 30, 2000.  Honey From the PRC, 66 Fed. Reg. 50,608, 50,610 (Dep't of Commerce Oct. 4, 2001) (notice of final determination of sales at less than fair value), *as amended by* Honey From the PRC, 66 Fed. Reg. 63,670 (Dep't of Commerce Dec. 10, 2001) (notice of amended final determination of sales at less than fair value and antidumping duty order) (collectively, the "Final Results").

In *Zhejiang V*, the court directed the Department to "use any analysis permitted by *Zhejiang IV* to complete its critical circumstances review, provided that it not use evidence prohibited by this opinion."  *Zhejiang V*, 35 CIT at __, Slip Op. 11-110, at 24; *see Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 34 CIT __, Slip Op. 10-30 (2010) (*Zhejiang IV*).  In these Third Remand Results, Commerce finds that critical circumstances did *not* exist.  Third Remand Results at 3.

Plaintiffs[1] assert that Commerce's critical circumstances determination is supported by substantial evidence and is in accordance with law, and that Commerce "clearly conformed to

---

[1]        Plaintiffs are Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

the Court's instructions" in *Zhejiang V*.  Pls.' Resp. to Def.-Ints.' Cmts. Re: Third Remand

Results 2 (ECF Dkt. No. 125) ("Pls.' Reply").

Defendant-intervenors,[2] however, urge that Commerce's "determination is not supported

by substantial evidence or in accordance with law."  Def.-Ints.' Cmts. to Third Remand Results

1–2 (ECF Dkt. No. 119) (Def.-Ints.' Cmts.").  Therefore, they ask the court to "again remand the

proceeding to Commerce [and] instruct[] the agency to determine, based on the record as [a]

whole and without requiring proof of actual importer knowledge of dumping, whether substantial

evidence supports imputing importer knowledge of dumping for purposes of an affirmative

critical circumstances determination."  Def.-Ints.' Cmts. 3.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. §§

1516a(a)(2)(A)(i)(II) and (B)(i) (2006).  For the reasons set forth below, the Third Remand

Results are sustained.

## **BACKGROUND**

The facts of this case are fully set forth in the prior decisions in *Zhejiang Native Produce*

*& Animal By-Products Imp. & Exp. Corp. v. United States*, 27 CIT 1827 (2003) (*Zhejiang I*),

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d

1363 (Fed. Cir. 2005) (*Zhejiang II*), *Zhejiang IV*, 34 CIT __, Slip Op. 10-30, *Zhejiang V*, 35 CIT

__, Slip Op. 11-110, and the court's Order of September 26, 2007 denying plaintiffs' USCIT

Rule 60(b) motion for relief from judgment, Ct. Order at 14 (Sept. 26, 2007) (ECF Dkt. No. 78)

("Sept. 26 Order").  A brief restatement of the case follows to place this opinion within its

broader context.

_____

[2]        Defendant-intervenors are The American Honey Producers Association and The
Sioux Honey Association (collectively, "defendant-intervenors").

In 1994, Commerce initiated an unfair trade investigation of honey from the PRC.  The investigation was subsequently halted when the Department entered into a suspension agreement with the PRC.  Honey From the PRC, 60 Fed. Reg. 42,521 (Dep't of Commerce Aug. 16, 1995) (suspension of investigation) (the "Suspension Agreement").  The Suspension Agreement was in effect from August 16, 1995 through August 16, 2000.  Honey From the PRC, 65 Fed. Reg. 46,426 (Dep't of Commerce July 28, 2000) (termination of suspended antidumping duty investigation).

In 2000, following the termination of the Suspension Agreement and at the urging of the domestic industry, Commerce initiated a second investigation.  Honey From Argentina & the PRC, 65 Fed. Reg. 65,831 (Dep't of Commerce Nov. 2, 2000) (initiation of antidumping duty investigations) (the "Second Investigation").  During the Second Investigation, the petitioners alleged the existence of "critical circumstances" which, if determined to exist, would result in antidumping duties going into effect ninety days earlier than would be the case in the absence of "critical circumstances."  *See* 19 U.S.C. § 1673b(e)(1) (2000); 19 C.F.R. § 351.206 (2002).  Generally, Commerce will find the presence of critical circumstances if there is a surge of imports and if the importers know or can be charged with knowing (1) that the product is being dumped, and (2) that there would be material injury as result of the dumped sales.  *See* 19 U.S.C. § 1673d(a)(3).

For the Second Investigation, Commerce identified the POI as January 1, 2000 through June 30, 2000, a period during which the Suspension Agreement was still in effect.  The Department used this POI to determine (1) if plaintiffs were dumping their merchandise, and (2) if critical circumstances were present.  *See* Honey From the PRC, 66 Fed. Reg. 24,101, 24,106

(Dep't of Commerce May 11, 2001) (notice of preliminary determination of sales at less than fair

value).

After completing its Second Investigation, Commerce issued an affirmative finding of

dumping and an affirmative finding of critical circumstances based on its "twenty-five percent"

methodology.  Final Results, 66 Fed. Reg. at 50,608, 63,671.  Under this methodology, the

Department considers dumping

> "margins of 25 percent or more for [export price] sales sufficient to impute
> knowledge of dumping" . . . . In other words, in cases where, as here, export price
> is calculated by reference to sales made to unaffiliated purchasers in the United
> States, and Commerce determines that the antidumping duty margin with respect
> to those sales is 25% or more, Commerce "imputes" knowledge of dumping to the
> importer

during the period leading up to the investigation.  *Zhejiang I*, 27 CIT at 1842–43 (citation

omitted).  In the Final Results, Commerce found that "there is evidence of the knowledge of

dumping . . . [that was] demonstrated by the fact that [plaintiffs] have dumping margins of over

25 percent."  *Zhejiang I*, 27 CIT at 1843 (internal quotation marks and citation omitted).  Based

on this imputation of knowledge, the Department issued an affirmative critical circumstances

determination.

Plaintiffs sought judicial review of the Final Results in this court, challenging (1) the

Department's "calculation of antidumping duty margins"; (2) Commerce's critical circumstances

determination based on the use of its twenty-five percent methodology to impute knowledge of

dumping; and (3) "the reliability of certain sources" of surrogate valuation data.  *Zhejiang I*, 27

CIT at 1831.  The court held that the Suspension Agreement did not prevent Commerce from

using its twenty-five percent methodology and remanded the case on the other questions.  *Id.* at

1849–50, 1855–56 (holding that compliance with a suspension agreement designed to prevent

the suppression of prices or price undercutting did not negate the use of Commerce's twenty-five

percent methodology to impute knowledge of dumping in a critical circumstances determination

because dumping and price suppression or undercutting are not the same thing).  Consequently,

the court sustained Commerce's affirmative critical circumstances determination.  *Id.* at 1851.

After remand, the court sustained the Department's determination that the honey had been

dumped and dismissed the case.  *See* Judgment (Aug. 26, 2004) (ECF Dkt. No. 47).

Plaintiffs appealed only the court's critical circumstances holding in *Zhejiang I* to the

Federal Circuit, again arguing that the existence of the Suspension Agreement prevented the

imputation of knowledge of dumping.  The Federal Circuit reversed the court's critical

circumstances decision, holding that plaintiffs' compliance with the Suspension Agreement

precluded an imputation of knowledge of dumping using the Department's twenty-five percent

methodology during the POI, and stating

> "[I]t strains credibility to suggest that Commerce could establish minimum prices
> for honey designed to 'prevent the *suppression or undercutting of price levels* of
> the United States honey products' and then determine that U.S. importers
> purchasing honey in accordance with these pricing guidelines should have known
> these sales would be found to be at *less than fair value*" [(i.e., were dumped)].
> When all factors are considered, there is not substantial evidence to support the
> finding of critical circumstances.

*Zhejiang II*, 432 F.3d at 1368 (citation omitted) (emphasis added).  Thus, the Court found that, in

the context of a critical circumstances determination, price suppression and price undercutting,

concepts normally associated with International Trade Commission ("ITC") injury

determinations, can play some role in a finding related to knowledge of dumping.[3]  The Court

then remanded the case to this court for further proceedings in accordance with its decision.  *Id.*

---

[3]      Dumping and sales at less than fair value *are* the same thing because sales at less
than fair value indicate that dumping is occurring.  *See* 19 U.S.C. § 1677b(a) (stating that in
order to make an antidumping determination, Commerce must determine "whether subject
merchandise is being, or is likely to be, sold at less than fair value.").

The court further remanded the matter to Commerce for reconsideration of the critical circumstances issue. *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 30 CIT 725, 725–26 (2006) (*Zhejiang III*). Pursuant to the Federal Circuit ruling, the court instructed Commerce to further consider "its critical circumstances finding, provided that in no event shall Commerce impute to plaintiffs any knowledge prohibited by the [Federal Circuit]'s decision." *Id.*

After the Federal Circuit's decision in *Zhejiang II*, plaintiffs filed a motion for relief from judgment under USCIT Rule 60(b). Pls.' Mot. for Relief from J. (ECF Dkt. No. 69) ("Pls.' Relief Mot."). By their motion, plaintiffs sought to amend the judgment of the court in *Zhejiang I*, arguing that, in light of the Federal Circuit's reversal in *Zhejiang II*, the judgment should be "modified with instructions requiring the Department to recalculate the dumping margins for [plaintiffs] in compliance with the appellate court's finding that sales made in compliance with the terms of the Suspension Agreement were not made at less than fair value and with instructions to amend the Antidumping Duty Order accordingly." Pls.' Relief Mot. 2. In other words, in addition to the remand to the Department relating to Commerce's critical circumstances determination, plaintiffs also "ask[ed] the court to direct Commerce to make the additional finding that their sales made during the [POI] for the Second Investigation were not made at less than fair value [(i.e., dumped)] because of plaintiffs' compliance with the Suspension Agreement. In seeking this relief, plaintiffs hope[d] to eliminate the antidumping duties imposed by the antidumping duty order." Sept. 26 Order at 5 (citation omitted).

In making their case, plaintiffs contended that "the Federal Circuit not only held that the Suspension Agreement precluded the imputation of knowledge of dumping in the context of a critical circumstances finding, but also held 'that sales made in compliance with the terms of the

Suspension Agreement were not made at less than fair value.'"  Sept. 26 Order at 6–7 (quoting

Pls.' Relief Mot. 2).  Thus, for plaintiffs, the logical extension of the Federal Circuit's

"suppression or undercutting of price levels" analysis was that they could not have been found to

have dumped honey during the POI.

The court denied this motion, stating that plaintiffs' requested relief "would be a

considerable expansion of the effect of the Federal Circuit's opinion, as it would wholly

eliminate the basis for the antidumping duty order."  Sept. 26 Order at 7.  The court based its

decision on two findings.

First, that the Federal Circuit's holding did "not reach the question of whether plaintiffs

could be found to be dumping during the POI[, but] held that a suspension agreement designed to

prevent the suppression and undercutting of price levels prevented the imputation of knowledge

of dumping to the [plaintiffs]" solely for purposes of finding critical circumstances.  Sept. 26

Order at 9; *see also* Sept. 26 Order at 13 ("Price suppression and sales at less than fair value are

just not the same thing.").

Second, "plaintiffs [were] not entitled to the relief they seek because they did not appeal

the court's holding that substantial evidence supported a determination that their sales during the

POI were made at less than fair value." Sept. 26 Order at 10–11 (citation omitted); *see also* Sept.

26 Order at 11 ("[W]hile they pursued the question of the imputation of knowledge with respect

to critical circumstances in their appeal, plaintiffs did not appeal this court's holding that

substantial evidence supported a finding of dumping during the POI.").

Plaintiffs appealed the denial of this motion to the Federal Circuit.  The Federal Circuit

dismissed the appeal, finding that it was interlocutory and therefore "simply an effort to obtain

review of an issue in a pending trial court proceeding without waiting for the trial court to enter a

final judgment in the case." *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp.*

*Grp. v. United States*, 339 F. App'x 992, 994 (Fed. Cir. 2009).

Following the remand ordered in *Zhejiang III*, Commerce filed its First Remand Results,

finding that critical circumstances did *not* exist.  Upon review of the First Remand Results, the

court remanded once again, explaining that the Federal Circuit's decision in *Zhejiang II* did not

prevent the Department from considering analyses other than the twenty-five percent

methodology or time periods other than the POI in making its critical circumstances

determination.  *Zhejiang IV*, 34 CIT at __, Slip Op. 10-30, at 20 ("Commerce has the authority to

exercise its discretion to apply any other reasonable method or look to any other reasonable time

period in making its critical circumstances determination.").  In addition, the court provided

examples of other methodologies Commerce might have employed.  *Id.* at __, Slip Op. 10-30, at

12 (citation omitted) ("Prior to its adoption of the 25 percent method, Commerce found that, with

respect to respondents from non-market economies, it would use a case by case determination

'using all available information and drawing upon market conditions of the industry subject to

the investigation' when imputing knowledge of less-than-fair value sales.").

Commerce then filed its Second Remand Results pursuant to *Zhejiang IV*, again using its

twenty-five percent methodology, but using as the time period for its analysis the 190-day period

between the initiation of the investigation and the issuance of the Preliminary Results.  *Zhejiang*

*V*, 35 CIT at __, Slip-Op. 11-110, at 10–11 (citing Results of Redetermination Pursuant to

Remand at 62–63 (Dep't of Commerce Dec. 8, 2010) (ECF Dkt. No. 95) ("Second Remand

Results")).  There, the Department found "that critical circumstances existed for Zhejiang . . .

because [based on the twenty-five percent methodology] 'record evidence demonstrates that

importers knew or should have known that the exporter was selling the subject merchandise at

less than its fair value.'" *Id.* at __, Slip-Op. 11-110, at 3 (quoting Second Remand Results at 42). In *Zhejiang V*, the court once again remanded to Commerce, finding "that Commerce's critical circumstances determination is not supported by substantial evidence." *Id.* at __, Slip-Op. 11-110, at 24.  In doing so, the court held that the Department's "application of the 25% methodology to the 190-day period beginning at the initiation of the less than fair value investigation through the Department's Preliminary Results is clearly authorized by *Zhejiang IV*." *Id.* at __, Slip-Op. 11-110, at 19.  The court further held, however, that Commerce's critical circumstances determination "lacks the support of substantial evidence because (1) the initiation of the antidumping investigation cannot be said to have put plaintiff on notice that the prices set by the Suspension Agreement were dumped prices, and (2) the prices importers paid did not materially change from the period when the Suspension Agreement was in effect." *Id.* at __, Slip-Op. 11-110, at 19–20.  The court then stated,

> as was shown in *Zhejiang IV*, Commerce had other evidentiary tools that it might have used to produce the substantial evidence needed to make its case.  For instance, in Potassium Permanganate From the PRC, 48 Fed. Reg. 57,347 (Dec. 29, 1983) (final determination of sales at less than fair value) ("*Potassium Permanganate*"), Commerce found that the importers were *actually aware* of the pricing of the merchandise for non-Chinese sources, and were, therefore, "aware of the entire range of pricing in a marketplace where pricing was a major factor in determining sales."  In *Nippon Steel Corp. v. United States*, 24 CIT 1158, 118 F. Supp. 2d 1366 (2000), this Court listed "numerous press reports [and] falling domestic prices resulting from rising imports" to support its determination.

*Id.* at __, Slip-Op. 11-110, at 23.  Hence, the court invited Commerce to explore the use of the analysis found in *Potassium Permanganate* along with the kind of evidence presented in *Nippon Steel* as a means for determining the existence of critical circumstances.  Accordingly, the court directed, "[o]n remand, the Department may use any analysis permitted by *Zhejiang IV* to complete its critical circumstances review, provided that it not use evidence prohibited by this

opinion.  In addition, Commerce may, in its discretion, reopen the record."  *Id.* at __, Slip-Op. 11-110, at 24.

The Department issued its preliminary Third Remand Results and received comments from both plaintiffs and defendant-intervenors.  At the request of defendant-intervenors, Commerce also "re-open[ed] the record on a limited basis . . . to solicit information 'concerning importers' knowledge of prices of honey from all sources imported into the United States during the time period after August 16, 2000.'"[4]  Third Remand Results at 5 (citation omitted).

On March 22, 2012, Commerce filed its Third Remand Results, finding that critical circumstances did *not* exist because the Department did "not find that importers knew or should have known that imports of subject merchandise . . . were at [less than fair value] prices."  Third Remand Results at 3.

**STANDARD OF REVIEW**

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

I.      **Legal Framework**

Under 19 U.S.C. § 1673d(a)(3), "critical circumstances" exist when

(A) . . . the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise

---

[4]      After reopening the record, defendant-intervenors submitted new factual information, "including United States pricing data on honey, trade journal articles, and testimony from the investigation at the International Trade Commission," and plaintiffs submitted an affidavit from an importer.  Third Remand Results at 6.

at less than its fair value and that there would be material injury by reason of such sales,

*and*

(B) there have been massive imports of the subject merchandise over a relatively short period.

19 U.S.C. § 1673d(a)(3) (emphasis added).

If the criteria for critical circumstances are met, then antidumping duties go into effect ninety days earlier than the effective date of antidumping duties in the absence of critical circumstances.  19 C.F.R. § 351.206(a).  While the statute specifies that this extension of antidumping duties is appropriate when importers "knew or should have known" that the price was below fair value and would materially injure domestic industry, the statute does not specify how the presence of such knowledge should be determined.  Therefore, Commerce has adopted a general practice of imputing knowledge (without requiring evidence of actual knowledge) when a calculated dumping margin for the POI is greater than twenty-five percent.

In the Final Results, "[t]he Department found evidence of massive imports of subject merchandise by [plaintiffs] within a relatively short period," thus fulfilling the second criterion for critical circumstances under 19 U.S.C. § 1673d(a)(3)(B).  Third Remand Results at 17 n.5. The court sustained this finding and plaintiffs did not challenge this aspect of the Final Results. *Zhejiang I*, 27 CIT at 1849 ("Plaintiffs do not challenge Commerce's massive imports determinations.").  Hence, the remaining issue is whether importers had or should have had knowledge that dumping was occurring, the first prong of 19 U.S.C. § 1673d(a)(3).

In the Third Remand Results, Commerce states that it normally employs its twenty-five percent methodology to impute knowledge, but that "the Court . . . made clear [in *Zhejiang V*] that any prices that were consistent with the suspension agreement prices cannot, alone, serve as

substantial evidence that the relevant party knew or should have know[n] that the sales were at

[less than fair value]." Third Remand Results at 18 (citing *Zhejiang V*, 35 CIT at __, Slip Op.

11-110, at 22–23). After reopening the record, "[t]he Department [did] not identif[y] any sales

of subject merchandise on the record that [were] inconsistent with the suspension agreement

prices." Third Remand Results at 18. For this reason, "consistent with the Court's opinion [in

*Zhejiang V*], the Department . . . examined the record to determine if there [was] any other

evidence demonstrating that the importers knew or should have known that the exporter was

selling subject merchandise at [less than fair value]." Third Remand Results at 18. Because it

failed to find such evidence, Commerce issued a negative critical circumstances determination.

Third Remand Results at 33.

      Defendant-intervenors challenge the Third Remand Results, and urge the court to remand

the Results to Commerce once again. In support of their position, defendant-intervenors offer

four arguments.

## II.    Proof of Actual Knowledge of Dumping

      Defendant-intervenors first argue that Commerce "narrowly interpret[ed] the Court's

remand instructions [in *Zhejiang V*] as requiring a finding that importers had *actual* knowledge

of dumping of Chinese honey to reach an affirmative critical circumstances determination and

rendering impossible the imputation of knowledge of dumping." Def.-Ints.' Cmts. 5.

Defendant-intervenors observe, however, that "actual knowledge of dumping is not a

requirement for an affirmative critical circumstances finding." Def.-Ints.' Cmts. 10.

Furthermore, defendant-intervenors urge that "the Court did not intend to require Commerce to

demonstrate actual importer knowledge of *dumping*, but instead to require evidence of actual

knowledge of *prices* and other information reasonably within the purview of importers from which knowledge of dumping could be imputed." Def.-Ints.' Cmts. 8.

Commerce, however, asserts that it did not adopt an "actual knowledge" requirement in the Third Remand Results. Def.'s Reply 15. Rather, the Department states that it first found that "the evidence does not demonstrate that U.S. importers had actual knowledge that honey from the PRC was priced at [less than fair value]." Third Remand Results at 27. It then further examined the record and found that the evidence did not support a determination that "importers knew *or should have known* that the exporter was selling subject merchandise at [less than fair value]." Third Remand Results at 17–18; Def.'s Reply 15 ("In addition to finding that the honey importers did not have actual knowledge of dumping, Commerce also 'examined the record to determine if there is any other evidence demonstrating that the importers . . . *should have known* that the exporter was selling the subject merchandise at [less than fair value].'") (quoting Third Remand Results at 18). For this reason, Commerce argues that it did not rely on an "actual knowledge" requirement to support its determination.

A review of the Final Results reveals that the Department did not rely solely upon an "actual knowledge of dumping" standard, despite defendant-intervenors' arguments to the contrary. Indeed, Commerce searched the record for any indication "that importers knew *or should have known* that imports of subject merchandise . . . were at [less than fair value] prices." Third Remand Results at 3 (emphasis added). As shall be seen, while the Department was able to find some evidence that importers were knowledgeable about the honey industry and pricing in general, absent from the record was evidence that they knew, or could be charged with knowing, that these prices were at less than fair value, rather than simply low. Therefore, the

Department did not unlawfully impose an "actual knowledge of dumping" requirement on its critical circumstances analysis.

## III.    Alternative Methodologies for Imputing Knowledge

Defendant-intervenors also object to Commerce's treatment of the alternative methodologies noted by the court in *Zhejiang V*. *See Zhejiang V*, 35 CIT at __, Slip Op. 11-110, at 23 ("Commerce had other evidentiary tools that it might have used to produce the substantial evidence needed to make its case.  For instance, in [*Potassium Permanganate*] . . . , Commerce found that the importers were *actually aware* of the pricing of the merchandise for non-Chinese sources, and were, therefore, 'aware of the entire range of pricing in a marketplace where pricing was a major factor in determining sales.'  In *Nippon Steel Corp.* . . . , this Court listed 'numerous press reports [and] falling domestic prices resulting from rising imports' to support its determination.") (citations omitted).

Had the Department correctly employed the methodologies from *Potassium Permanganate* and *Nippon Steel*, defendant-intervenors insist that it would have identified record evidence to support a finding of importer knowledge.  Def.-Ints.' Cmts. 6–7 (*Zhejiang V* "permit[s] Commerce to impute knowledge of dumping using the 25 percent test if supported by substantial evidence of the type that Commerce had relied upon and the Court had upheld in Potassium Permanganate and Nippon Steel.  Such evidence includes broad knowledge of market prices for various sources of the allegedly dumped product and the presence of falling prices resulting from rising subject imports.").  Consequently, defendant-intervenors believe that the evidence they have placed on the record, which they contend is the kind of evidence found in *Potassium Permanganate* and *Nippon Steel*, could have been used by Commerce on remand, in combination with the twenty-five percent methodology, to impute knowledge of sales of honey at less than fair value.  Put another

way, defendant-intervenors claim that knowledge of low prices together with margins determined to

be twenty-five percent or more would be sufficient to impute knowledge that the honey was dumped.

In response, Commerce first asserts "that as a result of the passage of time and the

changes made to the statute and Commerce's non-market economy analysis, the methodology

used in *Potassium Permanganate* to find critical circumstances was no longer reasonable."

Def.'s Reply 6; Third Remand Results at 20 ("The Department no longer considers the analysis

used in *Potassium Permanganate* an appropriate framework for determining critical

circumstances because export prices from a broad range of third countries may not be

representative of normal value for a PRC product.  In the nearly 30 years since the agency issued

its determination in *Potassium Permanganate*, . . . the Department's [non-market economy]

methodology have changed significantly.").

Specifically, in a non-market economy country situation, "the Department now

determines the existence of dumping, and of critical circumstances, by comparing a product's

U.S. prices to normal value calculated using factors of production from an economically

comparable country, and not by comparing U.S. prices to the prices of that product from other

countries exporting the product, *regardless of economic comparability*."  Third Remand Results

at 21 (emphasis added).  That is, in *Potassium Permanganate*, the Department based its critical

circumstances determination on a direct comparison of the price of the potassium permanganate

from the PRC (a non-market economy country) to the price of potassium permanganate imported

from Spain (a market economy country).  *See* Third Remand Results at 21 n.8.  Under the

Department's critical circumstances methodology that is used today (i.e., the twenty-five percent

methodology), surrogate prices for the factors of production are used to determine normal value

and that value is compared to the U.S. price to determine a dumping margin.  If the margin is

twenty-five percent or more, this can result in a critical circumstances determination based on

imputation of knowledge of dumping.  Thus, for Commerce, because its critical circumstances methodology has matured to take into account actual evidence of dumping, the price comparisons found in *Potassium Permanganate* simply have no role in determining critical circumstances because they have no role in a less than fair value determination.

Nevertheless, based on the court's citation of earlier critical circumstances findings, the Department reopened the record and made the price comparisons defendant-intervenors sought. Third Remand Results at 23–32.  To this end, in order "to comply with the Court's remand order, Commerce examined the evidence in light of *Potassium Permanganate* and *Nippon Steel* [and] found that even using these methodologies, substantial evidence did not support a finding that United States importers knew or should have known honey . . . from China was being sold at less than fair value."  Def.'s Reply 6–7.  As shall be seen, the Department reached its conclusion based on its finding that, although the importers were generally aware of honey prices, the level of awareness did not rise to the level found in these prior investigations.

Finally, the Department emphasized the court's statement in *Zhejiang V* "that a critical circumstances determination based solely on prices that are 'broadly the same' as those established under the Suspension Agreement, even if taken from the period following the Suspension Agreement's termination, cannot be supported by substantial evidence."  *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 22–23.  Here, "the record demonstrates that U.S. importers stated that the Chinese government's quota licensing system kept prices at the same or higher levels than those at the time of the Suspension Agreement."  Third Remand Results at 32.  That is, the prices on the record for the period following the termination of the Suspension Agreement were the same as or higher than the prices established by the Suspension Agreement.  Third Remand Results at 32.  Therefore, the Department believes that its finding comported with the

court's decision in *Zhejiang V*, which held that a critical circumstances determination would not

be supported by substantial evidence if it were based on prices that were "broadly the same" as

those in the Suspension Agreement.  *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 22–23.

Based on the foregoing, the court finds that Commerce reasonably considered the

alternative methodology used in the critical circumstances determination made in *Potassium*

*Permanganate* and the kind of evidence found in *Nippon Steel* and determined that they did not

lead to an affirmative critical circumstances determination in this case.  First, Commerce has

convincingly explained why the analysis performed in *Potassium Permanganate* is no longer a

valid method of determining knowledge of sales having been made at less than fair value.  *See*

Third Remand Results at 21–22 ("[A] comparison of U.S. sales prices of subject merchandise

from the country under investigation to sales prices of the same merchandise sold into the United

States from other countries, . . . [can no longer] be a reliable indicator of whether or not sales of

subject merchandise under investigation are being sold at [less than fair value].").  This is

because the standard found in the statute is knowledge of dumping.  Therefore, the critical

circumstances determination in *Potassium Permanganate*, which was based on a direct

comparison of the prices of the potassium permanganate from the PRC to the prices of potassium

permanganate imported from Spain, would not be used today to establish that sales were made at

less than fair value.  Today, determinations of sales at less than fair value in a non-market

economy country are derived from normal value, which is calculated using the factors of

production from a surrogate country.  *See* Third Remand Results at 21 n.8.  Thus, the

Department's former methodology based on a price comparison alone would reveal nothing of

knowledge of dumping, while the methodology used today would.

Commerce's determination as to whether a critical circumstances methodology will result in valid results is entitled to deference.  *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference."); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994).  Here, it is difficult to see how, under the facts of this case, Commerce's former price analysis would have been useful in making a determination that, according to the statute, must be based on an actual or imputed knowledge of dumping.  19 U.S.C. § 1673d(a)(3)(A); *see* Sept. 26 Order at 13 ("Price suppression and sales at less than fair value are just not the same thing.").

Moreover, as the review of evidence later in this opinion reveals, the Department reasonably attempted to use the "other evidentiary tools" identified by the court and by defendant-intervenors.  In doing so, Commerce concluded that the evidence in this case would not have supported an affirmative critical circumstances determination, even if the *Potassium Permanganate* or *Nippon Steel* analyses were valid.  The evidence only revealed that importers had a general knowledge of honey prices that were equal to or higher than those found in the Suspension Agreement.  Third Remand Results at 27.  Thus, the more particularized knowledge of prices found determinative in *Potassium Permanganate* is absent here.

Finally, the Department examined the record of prices during the 190-day period between the initiation of the investigation and the issuance of the Preliminary Results and found that all of the prices were "'broadly the same' as those established under the Suspension Agreement." Third Remand Results at 27 (citation omitted).  As noted, the Federal Circuit has found that imputation of knowledge of dumping is incompatible with sales of merchandise that comply with the prices found in the Suspension Agreement.  *Zhejiang II*, 432 F.3d at 1368 ("[I]t strains

credibility to suggest that Commerce could establish minimum prices for honey designed to 'prevent the suppression or undercutting of price levels of the United States honey products' and then determine that U.S. importers purchasing honey in accordance with these pricing guidelines should have known these sales would be found to be at less than fair value.") (citation omitted). Therefore, in order to overcome the Federal Circuit's holding and make an affirmative critical circumstances finding, Commerce would have had to find evidence of actual knowledge of dumping or evidence from which knowledge of dumping could be imputed.  Because the record did not contain this evidence, Commerce was unable to support with substantial evidence an affirmative critical circumstances determination in light of the court's statement in *Zhejiang V* that "a critical circumstances determination based solely on prices that are 'broadly the same' as those established under the Suspension Agreement, even if taken from the period following the Suspension Agreement's termination, cannot be supported by substantial evidence."  *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 22–23.

     In summary, the court holds that the Department is correct that the methodologies found in *Potassium Permanganate* and *Nippon Steel* would not yield reliable indications of critical circumstances, and it did not err in its use of the methodologies found in *Potassium Permanganate* and *Nippon Steel*.

## IV.    Consideration of the Record Evidence as a Whole

     In a related argument, the defendant-intervenors' next claim is that Commerce failed to consider the record evidence as a whole, as is required by the *Potassium Permanganate* methodology.  If the Department had done so, defendant-intervenors claim, the record now contains information "that should lead to the conclusion that importers had sufficient knowledge of market pricing to be on notice that imports of honey from China during the 190-day period

were likely to be dumped in light of the more than 25 percent dumping margins on such

imports."[5]  Def.-Ints.' Cmts. 18.  Hence, the defendant-intervenors assert that new evidence they

have placed on the record, including industry, non-industry, and government publications and

findings, is of the type that was important in *Potassium Permanganate*, and supports the

imputation of knowledge based on the twenty-five percent methodology.  Therefore, "[b]ased on

these facts, and the application of the 25 percent rule to imports during 190-day period, importers

knew or should have known that the Chinese honey import prices were less than fair value."

Def.-Ints.' Cmts. 19; Def.-Ints.' Cmts. 7 ("[T]he record now contains such substantial evidence

to support Commerce's use of the 25 percent test . . . , including evidence of importer knowledge

of pricing from various sources and a variety of other evidence that should have led the importers

to have reason to know that dumping was occurring.").

     First, defendant-intervenors claim that record evidence demonstrates that importers were

actually aware of market pricing of honey from the relevant source countries.  Def.-Ints.' Cmts.

19–20, 24.  According to these domestic producers, they placed evidence on the record which

demonstrates that importers had actual knowledge of prices from which knowledge of dumping

---

[5]    In particular, defendant-intervenors argue that the twenty-five percent
methodology can now be supported with substantial evidence of the type used in making the
affirmative critical circumstances determination in *Potassium Permanganate*, including evidence

    that: (1) Argentina and China were the primary import sources for honey and
there [was] a relatively small number of sources of honey; (2) U.S. importers
were fully aware of honey prices from all major sources; (3) U.S. importers were
aware of the Suspension Agreement's failure to prevent price depression, the
Suspension Agreement's expiration, and of an imminent dumping case against
Chinese honey imports; (4) Chinese honey prices were 24.5 percent less than
honey from fairly-priced source countries during the 190-day period from the
initiation to the preliminary determination; and (5) massive imports of Chinese
honey occurred during the same period.

Def.-Ints.' Cmts. 18–19.

could be imputed.  Specifically, they point to the widespread reporting of honey pricing in

government and industry publications and newspaper articles.  Def.-Ints.' Cmts. 20 ("The market

knowledge came not only from their experience in importing from multiple sources, . . . it also

came from the widespread publication of honey prices by the Agricultural Marketing Service . . .

of the United States Department of Agriculture.").

Second, defendant-intervenors "submitted numerous newspaper articles, industry

publications, and government publications which demonstrate that importers had knowledge of

. . . specific differentials between such prices, decreasing prices of Chinese honey imports, and

that the filing of a new dumping case was imminent."  Def.-Ints.' Cmts. 31; *see also* Def.-Ints.'

Cmts. 33–34 ("All of the mainstream news articles show that importers and the general public

were well aware of the relative prices of honey from different sources; that Chinese honey was

the cheapest source and was being dumped on the U.S. market; and that the filing of a new

dumping case was imminent.  It is thus unreasonable for Commerce to conclude that U.S.

importers of honey did not know these facts as well.").

Third, defendant-intervenors contend that testimony before the ITC, ITC findings, and

ITC staff reports demonstrate that importers had knowledge of honey market prices and

underselling.  In particular, defendant-intervenors state that "the importers themselves

specifically testified at the preliminary staff conference of the ITC that they had such broad

knowledge."  Def.-Ints.' Cmts. 25.  Furthermore, the ITC "concluded that the significant price

effects and volume effects of imports of honey from China had a significant adverse impact on

the domestic industry, leading to a finding that there was a reasonable indication of material

injury by reason of the subject imports."[6]  Def.-Ints.' Cmts. 27 (citation omitted).

In response, Commerce notes that, as a preliminary matter, "[o]f the total of eight non-industry newspaper articles placed on the record, five of these were published while the suspension agreement was still in effect.  Therefore, the Department believes that[, in accordance with the Federal Circuit opinion in *Zhejiang II*,] these articles could not have alerted honey importers that the honey they were importing from the PRC was being sold for [less than fair value]."  Third Remand Results at 30.

Next, Commerce disputes both the probative value and the sufficiency of the evidence highlighted by defendant-intervenors.  That is, for Commerce, the material defendant-intervenors placed on the record neither demonstrates that plaintiffs had a detailed knowledge of honey pricing, nor that plaintiffs could be said to have either actual or imputed knowledge of dumping, even using the *Potassium Permanganate* methodology.  This is especially true because the record evidence indicates that there were a large number of companies exporting honey into United States from at least seven countries, making it difficult to assume that honey importers could be charged with knowledge of pricing from all sources.  Def.'s Reply 11; Third Remand Results at 24–25.  This is in contrast to the "closely knit industry" in *Potassium Permanganate* where the product was only available from two countries other than the PRC, and therefore importers could be charged with being "acutely aware of pricing from *all* sources."  Third Remand Results at 24; Third Remand Results at 23 ("[T]he agency found that the number of

---

[6]  "Specifically, imports of honey from China were, on average, 23.2 percent below those from all other countries beside Argentina (which with China was then subject to an ongoing antidumping duty investigation) during the period Commerce has identified as relevant. This is higher than the 22 percent price difference (underselling margin) Commerce relied on in Potassium Permanganate to justify its critical circumstances finding."  Def.-Ints.' Cmts. 31 (citations omitted).

companies that produced and marketed potassium permanganate was limited to a single company

in the United States (Carus Chemicals), a single company in Spain (Asturquimica), and several

companies in the PRC.").

As to the content of the articles themselves, the Department agrees that "all of the

newspaper articles, including those in both industry and non-industry publications, indicate that

importers knew the general conditions in the U.S. honey market, and were aware that low-priced

honey was being imported from other countries."  Third Remand Results at 31.  The Department

notes that although the prices were low, they were equal to or higher than those found in the

Suspension Agreement.  Consequently, the Department found that the facts did not support

defendant-intervenors' contentions.

Commerce also returns to its argument that evidence of knowledge of low-priced sales, or

even of undercutting, may not be used to demonstrate actual knowledge or to impute knowledge

of dumping, and thus that the *Potassium Permanganate* methodology is no longer an appropriate

means of determining knowledge of or imputing knowledge of dumping.  Therefore, "[w]hile

these prices may indicate an awareness of the pricing levels of PRC and Argentine honey

imports, . . . the Department determines a dumping margin by calculating the difference between

a producer's normal value and U.S. price, and not by calculating the difference in price between

PRC goods and third country goods sold in the United States."  Third Remand Results at 31.

As to the information from the ITC, Commerce notes that defendant-intervenors "state

that the ITC determined that the prices and volumes of PRC honey imports had a significant

negative impact on the U.S. honey industry and was a reasonable indication of material injury by

reason of subject imports."  Third Remand Results at 28.  The Department reiterates, however,

that evidence of low prices and high volume, or even of injury, are not evidence of sales at less

than fair value.  Third Remand Results at 31 ("[T]he Department does not agree with [defendant-intervenors' contention that knowledge of low-priced imports generally, or of the specific prices of these imports, necessarily indicates the U.S. importers knew or should have known that honey from the PRC was being sold at [less than fair value].").

The court agrees with defendant that, taken as a whole, the record evidence indicates some awareness of pricing and other market factors among U.S. honey importers.  It does not, however, demonstrate that importers had knowledge of sales at less than fair value during the relevant period, nor does the record contain evidence from which such knowledge could be imputed.

First, Commerce correctly disregarded the information placed on the record by the defendant-intervenors that was from the period when the Suspension Agreement was still in effect because this information cannot form the basis for the imputation of knowledge.  *See Zhejiang II*, 432 F.3d at 1368 ("[I]t strains credibility to suggest that Commerce could establish minimum prices for honey designed to 'prevent the suppression or undercutting of price levels of the United States honey products' and then determine that U.S. importers purchasing honey in accordance with these pricing guidelines should have known these sales would be found to be at less than fair value.") (citation omitted).

Second, as noted, "in prior critical circumstances determinations [(i.e., those conducted prior to the adoption of the 25% methodology)], the Department had based its affirmative critical circumstances determination on the agency's finding that 'importers were actually aware of the pricing of the merchandise for non-Chinese sources, and were, therefore, aware of the entire range of pricing in a marketplace where pricing was a major factor in determining sales.'"  Third Remand Results at 2–3 (quoting *Zhejiang V*, 35 CIT at __, Slip Op. 11-110, at 23).  In *Potassium*

*Permanganate*, for example, "the Department found that it was reasonable to rely on an *assumption* that U.S. importers were aware of prices from Spain, because the subject merchandise was produced and marketed by a limited number of companies from within a similarly limited number of countries."  Third Remand Results at 24.

Here, as noted, the Department found that the evidence "demonstrates that United States importers were aware to some degree of world market prices of honey, but fails to conclusively establish that they were aware of the full range of prices.  Specifically, the evidence establishes that at least seven countries—Argentina, Canada, Chile, Mexico, China, Uruguay, and Vietnam—exported honey to the United States, and that other sources of honey imports may exist."  Def.'s Reply 11; Third Remand Results at 24.

A review of the evidence confirms that the Department correctly found that, in contrast to the "closely knit industry acutely aware of pricing from *all* sources" that was present in *Potassium Permanganate*, today's honey industry is composed of a large number of companies that conduct business in many countries, thereby reducing the possibility of awareness of "pricing from all sources."  Third Remand Results at 24; Third Remand Results at 26–27 ("[W]hile U.S. importers were aware, to some degree, of world market prices of honey, the evidence does not conclusively demonstrate that they were aware of the full range of prices, as they were in *Potassium Permanganate*, because of the more numerous countries from which honey was, or could have been, exported to the United States.").  In other words, in *Potassium Permanganate*, unlike in this case, there were so few exporters of potassium permanganate that it would be difficult to find that a U.S. importer of potassium permanganate was not intimately familiar with the pricing from the limited number of sources.

Next, the evidence that defendant-intervenors cite as showing actual knowledge of dumping or actual knowledge that plaintiffs' prices were below the domestic cost of production does not tend to prove their case.  That is, defendant-intervenors rely on evidence (i.e., the newspaper articles, industry publications, and government publications) that demonstrates only that readers of this material would be made aware of general pricing conditions and other market factors, including the relatively low prices for Chinese honey, but not that such low prices were the result of sales at less than fair value.  In addition, the evidence shows that plaintiffs were aware that these prices, while low, were equal to or greater than those found in the Suspension Agreement, prices which the Federal Circuit has found would preclude an imputation of knowledge of dumping.  In like fashion, the ITC evidence shows that low prices were causing injury, but says nothing about prices being at less than fair value.

Therefore, Commerce was reasonable in its conclusion that, taken as a whole, the evidence did not show that plaintiffs either had, or could be charged with having, knowledge that honey was being dumped by Chinese exporters during the 190-day period between the initiation of the investigation and the issuance of the Preliminary Results.

## V.      The Import Surge

The defendant-intervenors' final argument is that the massive increase in honey imports from the PRC, which Commerce found in its original affirmative critical circumstances determination, occurred in response to the initiation of the Second Investigation.  Def.-Ints.' Cmts. 13–16.  For this reason, defendant-intervenors assert that "[i]mporters must have had ample reason to believe that they were buying these imports at dumped prices at the time they made their decision to accelerate their imports, because if they didn't have such reason, they would have had no reason to rush in the imports, and the[re] would have been no surge."  Def.-

Ints.' Cmts. 36.  According to defendant-intervenors, "there was a substantial surge, which the importers obviously undertook because they knew or suspected that they were paying dumped [prices] for the imports."  Def.-Ints.' Cmts. 36.

In response, Commerce notes that, under the statute, "the Department must base its affirmative critical circumstances determination on two <u>separate</u> findings—one with regard to importers' knowledge of [less than fair value] pricing and the other with regard to a surge of imports."  Third Remand Results at 29.  Here, "Commerce had already determined that a surge of imports over a relatively short period of time existed, thereby satisfying one of the two statutory requirements.[7]  This finding, however, does not support nor does it satisfy the separate statutory requirement of establishing importer knowledge of dumping."  Def.'s Reply 18.  In other words, for Commerce, defendant-intervenors have conflated the two separate statutory requirements for a finding of critical circumstances, and have attempted to bootstrap the finding of a surge to necessarily require a finding that plaintiff knew or should have known that honey was being sold at less than fair value.

The court agrees with defendant that the import surge is a separate statutory requirement necessary for a critical circumstances determination, but is not, standing alone, sufficient for such a finding.  Were this not the case, evidence of a surge would be the only criterion necessary for an affirmative critical circumstances determination.  The import surge, moreover, does not speak to the first criterion of importers' knowledge, which has been the crux of these lengthy proceedings.

---

[7]        In particular, in the Final Results, "[t]he Department found evidence of massive imports of subject merchandise by [plaintiffs] within a relatively short period," thus fulfilling the second criterion for critical circumstances under 19 U.S.C. § 1673d(a)(3)(B).  Third Remand Results at 17 n.5.

That this is the case can be seen from plaintiffs' observations that there may be many reasons for a surge in imports, other than importer knowledge that dumping is occurring. *See* Pl.'s Br. 10 ("[P]erhaps the most rational reason why a company would purposely accelerate imports after an antidumping duty investigation is commenced would be to avoid the uncertainty which arises when merchandise is subject to 'suspension of liquidation,' as distinguished from a belief that the merchandise is actually dumped. An importer's liability for antidumping duty is only set in stone when its entries are liquidated, after an Annual Review is completed and after litigation is concluded, an event which may not take place for many years after entry."). Thus, while it may be that the importers increased their honey purchases in anticipation of the investigation, the surge alone does not amount to substantial evidence that they were aware, or should have been aware, that the honey was being dumped. For these reasons, Commerce's conclusion that a finding that there was a surge of honey imports does not necessarily result in the imputation of knowledge of dumping, is sustained.

## **CONCLUSION**

For the foregoing reasons, Commerce's determination that critical circumstances did not exist because U.S. importers did not possess the requisite knowledge that exporters were selling the subject merchandise at less than fair value was supported by substantial evidence and made in accordance with law.

Accordingly, Commerce's Final Results of Redetermination are sustained.

_____
/s/ Richard K. Eaton
Richard K. Eaton

Dated: June 18, 2013
       New York, New York